Argued and submitted November 20, 1998, reversed and remanded May 12, 1999

# STATE ex rel Robert CRUMPTON,
*Appellant,*

*v.*

## Phil KEISLING,
Secretary of State,
*Respondent,*

*and*

## CITIZENS FOR FAIR GOVERNMENT,
John Doe I and John Doe II,
*Defendants.*

(97C-11659; CA A99474)

982 P2d 3

Gregory A. Hartman, argued the cause for appellant. With him on the briefs were Sean A. Lyell and Bennett, Hartman, Reynolds & Wiser.

Daniel Rives Kistler, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, S. J.*

---

\* Retired February 28, 1999.

### WARREN, S. J.

Relator in this mandamus action appeals from a judgment for defendant, the Oregon Secretary of State,[1] in a dispute over whether ORS 260.044 required the person responsible for a political mailing and a newspaper advertisement that appeared shortly before the 1996 general election to file a statement of expenditures with defendant's office. Relator seeks an order requiring defendant to determine whether those responsible for the mailing and advertisement had complied with Oregon law. We reverse and remand for the trial court to grant the requested relief.

Relator describes the mailing in his brief:

"The first piece is a mailing on one side of which, printed in large four-inch high bright orange letters against a black background appears the word 'WARNING.' On side two, is a one-and-a-half-inch high by thirteen-inch long bright orange banner headline reading, 'IT'S OUTRAGEOUS,' accompanied by the warning, 'BEWARE: PUBLIC EMPLOYEE UNIONS ARE BUYING ELECTIONS.'

"In the middle portion of side two are four separate paragraphs, which are represented to be excerpts from three different newspapers, carrying headlines which decry the public employee unions' alleged 'deep pockets,' 'election fixing,' and 'sucker punch.' Along the bottom, in large letters, appears the statement, 'UNION BOSSES ARE BUYING ELECTIONS.' Next to and immediately above this statement are black and white photographs of fourteen [D]emocratic candidates, each of whom is partially obscured by a bright orange 'PUBLIC EMPLOYEE FINANCED' brand across the forehead."

In addition to declaring that the candidates were "PUBLIC EMPLOYEE FINANCED," the brands across the candidates' foreheads gave the percentage of the contributions to each candidate that allegedly came from public employee unions. The newspaper advertisement was identical in substance to the mailing, although necessarily in a modified format.[2]

---

[1] The other defendants, Citizens for Fair Government, John Doe I, and John Doe II, are not parties to this appeal.

[2] Because the issues involving the mailing and the advertisement are identical, our references to the mailing include the advertisement.

Before the election, relator filed a complaint with defendant alleging that the mailing was an "expenditure," as defined in ORS 260.005(6), that was "in support of or in opposition to a candidate for an office that is not statewide[.]" ORS 260.044(1)(b). As a result, according to relator, ORS 260.044(1) requires those who made the expenditure to file reports of those expenditures with defendant's office.[3] Defendant responded that the mailing "contains no language which suggests that a reader should not vote for any of the candidates listed" but, rather, directed its outrage toward "union bosses." Defendant concluded that the mailing made no statement that "*specifically* reflected adversely on the candidates the authors might have wished to defeat" and, thus, was exempt from the registration requirements.

After the election, relator filed this action. In response, defendant asserted that ORS 260.044(1) applies only to express advocacy, a concept that, he said, quoting the definition of "independent expenditure" in ORS 260.005(8), "is defined primarily by illustrations as meaning 'expressions such as "vote for," "elect," "cast your ballot for," "vote against," "defeat" or "reject." ' " The trial court apparently accepted that position when it granted defendant's motion to dismiss.

On appeal, defendant expands on his argument to the trial court, relying on *Buckley v. Valeo*, 424 US 1, 96 S Ct 612, 46 L Ed 2d 659 (1976), and subsequent federal appellate cases to support his position that a narrow definition of "expenditure" is necessary for ORS 260.044(1) to be consistent with federal constitutional requirements.[4] In *Buckley* the United States Supreme Court narrowly construed portions of the federal election laws in order to avoid potential constitutional problems of vagueness and interference with First Amendment rights. Before considering that argument, we first look at the statute itself.

---

[3] Relator also asserted that the mailing was an "independent expenditure" under ORS 260.005(8) that was subject to reporting and contribution limits under ORS 260.160 *et seq.* In *Van Natta v. Keisling*, 324 Or 514, 931 P2d 770 (1997), the Supreme Court declared that the relevant portions of ORS 260.160 *et seq.* are void. We therefore do not consider that issue.

[4] The parties do not raise any issues under Article I, section 8, or any other portion of the Oregon Constitution.

Since its original enactment in 1973, and despite substantial changes in the intervening years, what is now ORS 260.044(1) has consistently required a person[5] who makes expenditures in more than a stated amount "in support of or in opposition to" candidates for certain public offices to file reports of contributions and expenditures. The general meaning of that requirement is clear. The applicable dictionary definition of "support" is "to uphold by aid, countenance, or adherence: actively promote the interests or cause of[;] * * * to advocate, endorse, vote for, or implement the policies, principles, or candidacy of[.]" *Webster's Third New Int'l Dictionary,* 2297 (unabridged ed 1993). The applicable definition of "opposition" is "hostile or contrary action or condition: action designed to constitute a barrier or check[.]" *Id.* at 1583. Under the common meaning of the words that the statute uses, thus, a person must file a statement of expenditures if the nature of the expenditures is either to promote or to express hostility to (or to attempt to create a barrier against) a specific individual's candidacy for a covered office.

The mailing asserts that "union bosses are buying elections" and gives pictures and names of specific candidates who, by necessary inference, are among those whose elections union bosses are allegedly purchasing. Fairly read, the mailing expresses hostility to the candidacies of those individuals and, thus, opposes their election. If we were to apply the most likely meanings of the statutory terms, we would hold that ORS 260.044(1) applies to the person who paid for this mailing.

The difficult issue in this case is the extent to which the First Amendment requires us to construe ORS 260.044 to be narrower than the natural meaning of the statute in order to avoid unconstitutional vagueness. Defendant essentially argues, based on the decision in *Buckley,* that the dictionary definitions are inadequate to protect essential First Amendment values. Rather, defendant argues, we must construe

---

[5] The statute defines "person" to mean "an individual, corporation, limited liability company, labor organization, association, firm, partnership, joint stock company, club, organization or other combination of individuals having collective capacity." ORS 260.005(15).

the statute much more narrowly in order to preserve its constitutionality. *Buckley* involved challenges to a number of provisions of the Federal Election Campaign Act of 1971. The first relevant provision was section 608(e)(1) of the Act, which limited expenditures by a person "relative to a clearly identified candidate" to $1,000 per year. The Court first considered whether the statute was unconstitutionally vague, pointing out that close examination of the limitation was necessary because the Act imposed criminal penalties in an area permeated by First Amendment interests. 424 US at 40-41. The Court noted that Congress had not defined what expenditures are "relative to" a candidate and that the use of so indefinite a phrase failed to mark a clear boundary between permissible and impermissible speech. Based on another portion of section 608(e)(1), however, it construed "relative to" as meaning "advocating the election or defeat" of a candidate, thus reducing the vagueness problem. *Id.* at 41-42.

The Court then turned to the problem of distinguishing between advocacy that focuses on an issue and advocacy that focuses on the election or defeat of a candidate. It noted that

> "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest." 424 US at 42.

In order to resolve that problem, the Court held, it was necessary to limit the coverage of the Act "to communications that include explicit words of advocacy of election or defeat of a candidate[.]" *Id.* at 43. In a footnote, the Court stated that its construction would restrict the application of the section "to communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Id.* at 44 n 52. Even after that narrowing construction, however, the Court concluded that the Act's limitation on expenditures was unconstitutional. *Id.* at 44-51.

A similar issue arose later in the opinion under section 434(e) of the Act, which required certain persons to file a statement of expenditures made "for the purpose of * * * influencing" the nomination or election of candidates for federal office. 424 US at 77. There again were problems of vagueness, related primarily to First Amendment speech and associational rights. Those problems, the Court stated, were "particularly treacherous where, as here, the violation of [the section's] terms carries criminal penalties and fear of incurring these sanctions may deter those who seek to exercise protected First Amendment rights." *Id.* at 76-77. It noted that "[d]ue process requires that *a criminal statute* provide adequate notice" that contemplated conduct is illegal and that a greater degree of specificity is necessary where the criminal statute involves First Amendment rights. *Id.* at 77 (emphasis added). In order to avoid those problems, the Court construed "expenditure," as applied to individuals other than candidates or political committees, to have the same meaning that it had under section 608(e)—that is, to refer only to funds used for communications that expressly advocate the election or defeat of a candidate. In a footnote, it stated that the examples of express advocacy that it had given for the purposes of section 608(e) applied to section 434(e) as well. *Id.* at 78-80 and n 108.[6]

In sum, the most serious problems that the Court found in the provisions that it considered in *Buckley* were that they were vaguely written in a way that could readily affect people whose focus was on issues rather than candidates and that they carried with them the threat of criminal punishments for a violation, significantly increasing their potential chilling effect. Each of those factors was part of the foundation for the Court's decision to construe the statutes to require the extreme precision that the court described.

Several federal appellate courts have applied these aspects of the decision in *Buckley* to specific situations. In

---

[6] After the decision in *Buckley*, Congress amended the Act to change the standards that the Court had held to be potentially vague so that they now apply only to expenditures "expressly advocating the election or defeat of a clearly identified candidate." 2 USC § 434(e). *See F.E.C. v. Central Long Island Tax Reform, Etc.*, 616 F2d 45, 52 (2d Cir 1980). Congress did not enact the specific examples of express advocacy that the Court gave in its footnotes.

*Central Long Island Tax Reform, Etc.*, the defendant distributed a flyer that contained a review of federal tax policy and listed what its sponsors believed to be the proper vote on a number of tax-related issues that had recently come before Congress. The flyer described the record of the local Congressman, stating that he had voted "wrong" 21 times and "right" 3 times. Although the defendant distributed the flyer in the fall of an election year, the flyer did not refer to the existence of a campaign or to the record of the Congressman's opponent, nor did it state how a person should vote. The closest it came to those actions was to exhort voters to let their Congressmen know how they felt about votes for increased taxes and to thank Congressmen who voted for lower taxes. 616 F2d at 50-51, 53. The Second Circuit had little difficulty in concluding that the flyer did not constitute the kind of expenditure that required the defendant to file a report of expenditures. The court emphasized the Supreme Court's concern to protect public discussion of issues and its recognition that that discussion " 'readily and often unavoidably draws in candidates and their positions, their voting records and other official conduct. Discussions of those issues * * * tend naturally and inexorably to exert some influence on voting at elections.' " That did not mean, however, that such discussions fell within the scope of the Act. 616 F2d at 53, *quoting Buckley*, 424 US at 42 n 50.

In contrast, in *Federal Election Com'n v. Furgatch*, 807 F2d 857 (9th Cir 1987), the defendant paid for an advertisement in two leading newspapers in the days immediately before the 1980 presidential election. The advertisement stated that President Carter had done a number of things that degraded the electoral process and lessened the prestige of his office, " '*And we let him do it.*' " At the end, the advertisement exhorted " 'DON'T LET HIM DO IT.' " 807 F2d at 858 (quoting advertisement, emphasis and capitalization in original). The question was whether 2 USC § 434(c) required the defendant to file a statement of expenditures because the advertisement was an independent expenditure. 2 USC § 431(17), as amended after *Buckley*, required a report for an independent expenditure that "expressly advocat[ed] the election or defeat of a clearly identified candidate[.]" *Id.* at 859. The Ninth Circuit discussed *Buckley* at some length,

focusing on the Supreme Court's distinction between issue discussion, on the one hand, and candidate-oriented speech on the other and noting that the "expressly advocating" standard is designed to limit the disclosure requirements to spending " 'that is unambiguously related to the campaign of a particular federal candidate.' " *Id.* at 860 (quoting *Buckley*, 424 US at 80).

The Ninth Circuit noted that whether the advertisement expressly advocated the defeat of Jimmy Carter was a close question. It stated that neither *Buckley* nor the few other relevant cases (including *Central Long Island Tax Reform, Etc.*) had given an adequate analysis of the standard to be used or even a thoughtful list of the factors to consider. The court did not believe that the phrase "express advocacy" drew a bright and unambiguous line; it also treated the list of words of advocacy in the Court's footnote as examples, not as a comprehensive list. 807 F2d at 860-61. After discussing *Buckley*, the Ninth Circuit concluded that the Act's disclosure provisions, properly applied, would have only a reasonable and minimally restrictive effect on the exercise of First Amendment rights. It also emphasized the importance of the purposes of the Act and that they not be "cleverly circumvented, or thwarted by a rigid construction of the terms of the Act." With that understanding, it attempted to fashion a comprehensive approach to what is "express advocacy." *Id.* at 862.

The beginning point for that comprehensive approach was that a "proper understanding of the speaker's message can best be obtained by considering speech as a whole." The Ninth Circuit rejected "the suggestion that we isolate each sentence and act as if it bears no relation to its neighbors." It also rejected the use of what it called "magic words" as the crucial test of express advocacy, noting that relying on such words would allow people to "remain just beyond the reach of the Act by avoiding certain key words while conveying a message that is unmistakably directed to the election or defeat of a named candidate." Although the court expressed concern about an excessive use of context in determining the meaning of a statement, it decided that context was a consideration, although one that should receive only limited weight. Context could clarify ideas or supply

premises that were not stated but that readers or viewers would necessarily understand. 807 F2d at 863.

The court then established the following standard:

> "We conclude that speech need not include any of the words listed in *Buckley* to be express advocacy under the Act, but it must, when read as a whole, and with limited reference to external events, be susceptible to no other reasonable interpretation but as an exhortation to vote for or against a specific candidate." *Id.* at 864.

That test, the court noted, has three main components: (1) speech is express if its message is unmistakable and unambiguous, suggesting only one plausible meaning; (2) speech is advocacy only if it presents a clear plea for action, not if it is merely informative; and (3) it must be clear what action is advocated. If there is any reasonable alternative reading of the speech in question, it cannot be express advocacy.

Based on those criteria, the court determined that the advertisement was express advocacy. The advertisement criticized Jimmy Carter for allegedly doing a number of things and then urged its readers not to let him do it. The only logical action that the reader could take in response was to vote against Carter's reelection.

> "The reader could not sue President Carter for his indelicate remarks, or arrest him for his transgressions. If Furgatch had been seeking impeachment, or some form of judicial or administrative action against Carter, his plea would have been to a different audience, in a different forum. If Jimmy Carter was degrading his office, as Furgatch claimed, the audience to whom the ad was directed must vote him out of that office. If Jimmy Carter was attempting to buy the election, or to win it by 'hid[ing] his own record, or lack of it' as Furgatch suggested, the only way to not let him do it was to give the election to someone else. Although the ad may be evasively written, its meaning is clear." 807 F2d at 865.

After *Furgatch*, the Federal Election Commission adopted a rule defining "express advocacy" that incorporated the concepts that the Ninth Circuit had discussed. In *Maine Right to Life Committee v. Fed. Elect. Com'n*, 98 F3d 1 (1st Cir

1996), the issue was the applicability of that rule to the Act's prohibition of corporate expenditures to advocate the election or defeat of a candidate; disclosure of those expenditures was not an issue.[7] The corporation involved had, as its primary purpose, advocated a particular position on a major public issue. The First Circuit, adopting the District Court's opinion in *Maine Right to Life Committee v. Fed. Elect. Com'n*, 914 F Supp 8 (D Me 1996), disagreed with the Ninth Circuit and held that the Supreme Court *had* in fact adopted a bright line rule "that may err on the side of permitting things that affect the election process, but at all costs avoids restricting, in any way, discussion of public issues." The expenditures in question, the court concluded, did not cross that bright line. In its discussion, the court commented that the Supreme Court

> "seems to have been quite serious in limiting FEC enforcement to *express advocacy*, with examples of words that directly fit that term. The advantage of this rigid approach, from a First Amendment point of view, is that it permits a speaker or writer to know from the outset exactly what is permitted and what is prohibited. * * * *The result is not very satisfying from a realistic communications point of view* and does not give much recognition to the policy of the election statute to keep corporate money from influencing elections in this way, but it does recognize the First Amendment interest as the Court has defined it." 914 F Supp at 12 (first emphasis partially added; second emphasis added).

The court also suggested that the advertisement involved in *Furgatch* could actually be read to call on its readers to do things other than vote against President Carter, such as calling a radio talk show or writing the President to change his actions. *Id.* For these reasons, it held that the portion of the rule based on *Furgatch* was invalid.

We now consider the effect of the federal cases on the proper construction of ORS 260.044(7). As do the federal courts, Oregon courts construe statutes to be constitutional if it is possible to do so. *See Salem College & Academy, Inc. v.*

---

[7] Other cases on which defendant relies also involved limits on or prohibitions of campaign expenditures rather than simply their disclosure. *See Federal Election Com'n v. Christian Action Network*, 110 F3d 1049 (4th Cir 1997); *Fed Elec. Com'n v. Colo Republican Fed. Camp. Com.*, 59 F3d 1015 (10th Cir 1995), *rev'd on other grounds* 518 US 604, 107 S Ct 2309, 135 L Ed 2d 795 (1996).

*Emp. Div.*, 298 Or 471, 695 P2d 25 (1985); *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 687 P2d 785 (1984). When the issue is the relationship between a statute and the protections of expression in Article I, section 8, of the Oregon Constitution, we give the statute a narrowing construction when necessary to preserve its constitutionality, if it is possible to do so with reasonable fidelity to the legislature's words and apparent intent. *See State v. Robertson*, 293 Or 402, 411-13, 649 P2d 569 (1982). A similar rule should apply when the First Amendment, rather than the Oregon Constitution, is involved. Before considering a narrowing construction of ORS 260.044(1), however, we must first determine the extent to which the statute may actually implicate the First Amendment concerns that the federal cases describe and, thus, the extent to which narrowing may be necessary.

There are two significant aspects of the federal cases. First, the Supreme Court in *Buckley* clearly distinguished between limits on contributions and the disclosure of expenditures; the first it invalidated even after giving the statute a limiting construction, while the second it upheld. Of the federal appellate cases that we have cited, which seem to include the leading appellate decisions in the area, *Furgatch* and *Central Long Island Tax Reform, Etc.* are the only ones that involved disclosure rather than limits. *Furgatch* is also the case that gave *Buckley* the broadest reading. It remains true, however, that the Supreme Court expressly applied the "express advocacy" standard to the disclosure requirement. More significant for our analysis is the Supreme Court's emphasis in *Buckley* that the criminal penalties that the Act provides as punishment for violators required it to adopt an extremely restrictive reading of the disclosure requirements of the Act. *See* 424 US at 76-77. Unlike the federal act, a violation of ORS 260.044(1) leads only to civil penalties; there is no possible criminal liablity. *See* ORS 260.993 (providing criminal penalties for violation of specific election laws, not including ORS 260.044); ORS 260.995 (providing civil penalties for violation of election laws in general). In light of the Court's statements in *Buckley*, that difference in sanctions affects the extent to which a narrowing construction of the Oregon law is necessary.

It is, thus, possible to resolve the Court's concern that persons engaged in issue advocacy not run afoul of the election laws without the necessity of the narrow, "magic words" approach that most federal courts seem to think the Court adopted in *Buckley*, an approach that, as the First Circuit noted, is not very satisfying as to either the realities of what an advertisement or flyer actually communicates or the purpose of the election laws. Those magic words do provide the certainty that a criminal statute requires, but when a statute that affects speech does not have criminal consequences, the constitutional requirements appear to be significantly less. *See, e.g., CSC v. Letter Carriers*, 413 US 548, 568-74, 93 S Ct 2880, 37 L Ed 2d 796 (1973) (Hatch Act restrictions of political activity of federal employees, defined as those acts that were prohibited by Commission determinations before July 19, 1940, are sufficiently precise to overcome challenge on grounds of vagueness; restrictions are "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with" 413 US at 579; only sanctions for violation are suspension or removal from office). We conclude that, whether or not the Ninth Circuit's approach in *Furgatch* is correct as to the federal Act with its threat of criminal punishment, it provides a proper foundation for construing the expenditure reporting requirements of ORS 260.044(1), with their limited civil sanctions.

As we previously noted, from its original adoption in 1973 to the present, ORS 260.044(1) has required disclosure only of expenditures "in support of or in opposition to" a candidate for public office. That phrase in itself is more limited than were the provisions of the federal Act that the Court considered in *Buckley*. In itself it suggests that the statute does not require the reporting of expenditures involving discussion of issues, even when that discussion inevitably touches on the conduct and views of public officials and candidates for public office. Thus, the flyer in *Central Long Island Tax Reform, Etc.*, which among other things described a Congressman's voting record and encouraged the recipients to communicate with him about it, would not have been an expenditure "in support of or in opposition to" a candidate

under ORS 260.044(1), even though the defendant distributed it during an election campaign. On the other hand, the advertisement in *Furgatch*, exhorting its readings not to let President Carter "do it," would have been an expenditure "in opposition to" a candidate, generally for the reasons that the Ninth Circuit described.

The heart of the *Furgatch* approach, as applied to the Oregon law, is to determine whether the nature of the publication *as a whole* is clearly to support or oppose a candidate for office. The purpose is not to search for magic words—which careful drafters can, as in this case, usually avoid—but to find the essential message that the publication communicates to the reader. In doing this, the context of the publication—particularly whether or not it came in the midst of a contested election campaign—can play a role in determining how the reader would understand it and, thus, what its message is.[8] As the *Furgatch* court pointed out,

> "[a] proper understanding of the speaker's message can best be obtained by considering speech as a whole. Comprehension often requires inferences from the relation of one part of speech to another. The entirety may give a clear impression that is never succinctly stated in a single phrase or sentence. Similarly, a stray comment viewed in isolation may suggest an idea that is only peripheral to the primary purpose of speech as a whole." 807 F2d at 863.

The court also explained the value of context in understanding the meaning that a publication might have:

> "A consideration of the context in which speech is uttered may clarify ideas that are not perfectly articulated, or supply necessary premises that are unexpressed but widely understood by readers or viewers. We should not

---

[8] A third publication that relator attached to his original complaint had the pictures of the same fourteen candidates with the amounts of union assistance that each had allegedly received at an earlier stage of the campaign. It also contained an express call for the reader to "Reject 'Union Labeled' Candidates" and referred specifically to three of the candidates and to their opponents in a way that unquestionably called for the reader to vote for the "non-union" opponents. In his amended complaint, relator did not assert that the third publication was part of a coordinated campaign with the two publications at issue on appeal or otherwise refer to it in any fashion. We do not consider, therefore, what, if any, role it might play as part of the context of the mailing.

ignore external factors that contribute to a complete under-standing of speech, especially when they are factors that the audience must consider in evaluating the words before it." *Id.* at 863-64.

We believe that the following criteria are both con-sistent with the normal meaning of the words that the legis-lature used in enacting the requirements of ORS 260.044(1) and with the requirements of the First Amendment, as applied to a statute that does not impose criminal penalties for its violation. The criteria are based on, but somewhat less restrictive than, the Ninth Circuit's discussion in *Furgatch*. They are sufficient to provide the precision that is necessary in the context of this specific statute.

■ We construe ORS 260.044(1) to require a person, as ORS 260.005(15) defines the term, to file a report of expen-ditures if the expenditure is for a publication that is in sup-port of or opposition to a candidate under the following crite-ria: (1) the message, in its context, clearly and unambiguously urges the election or defeat of one or more identifiable candidates for a covered office; (2) the message, as a whole, seeks action rather than simply giving informa-tion; and (3) it is clear what action the message advocates. Those criteria fit well within both the dictionary definitions of the terms that the legislature used and the legislature's apparent purpose in enacting the statute; they are thus within the *Robertson* rule for a narrowing construction. They give a potential publisher a clear basis for deciding whether it will be necessary to report expenditures on a proposed publication.

■ Applying those criteria to the mailing indicates that the mailing was an expenditure in opposition to the 14 can-didates shown. We read the mailing as a whole and in light of its publication immediately before the election. The outside of the mailing is the word "WARNING" in large type. That word is repeated in type almost as large at the top of the inside once it is unfolded. The mailing then states, again in large type, that "IT'S OUTRAGEOUS" and warns that public employee unions are buying the "DEMOCRAT[IC] ELEC-TIONS," along with a number of quotations from newspapers that follow the same theme. Finally, at the bottom of the page

are pictures of the specific candidates with the alleged percentages of public employee union support placed across the tops of their heads.

The purpose of the mailing is patently to create opposition to the alleged attempt of public employee unions to buy the upcoming election through their support of a number of specific Democratic candidates. The only reasonable understanding of the mailing is that it is intended to lead readers to oppose the candidates shown, something that, in light of the upcoming election, they could do only by voting against them. There is no other obvious (or nonobvious) reason for anyone to make the mailing at that time. In that respect, the mailing is similar to (even if a little less precise than) the advertisement attacking President Carter that the Ninth Circuit discussed in *Furgatch*. Because the issue in this case is simply the requirement to report expenditures, and because there are no criminal penalties that require the greatest level of precision in a statute that affects First Amendment rights, we hold that the mailing comes within the requirements of ORS 260.044(1).

Reversed and remanded.