The LEAGUE OF WOMEN VOTERS OF COLORADO, a Colorado non-profit corporation, and Colorado Common Cause, a Colorado non-profit corporation, Plaintiffs–Appellants,

v.

Donetta DAVIDSON, Secretary of State of Colorado; Centennial Spirit, a Colorado non-profit corporation; Donald K. Bain; and Natalie Meyer, Defendants–Appellees.

No. 00CA0216.

Colorado Court of Appeals, Div. V.

April 12, 2001.

Kelly/Haglund/Garnsey & Kahn LLC, Christine L. Murphy, Martha M. Tierney, Denver, CO, for Plaintiffs–Appellants.

Ken Salazar, Attorney General, Maurice G. Knaizer, Deputy Attorney General, Denver, CO, for Defendant–Appellee Donetta Davidson.

Ballard Spahr Andrews & Ingersoll, LLP, Kevin M. Shea, Jon Bernhardt, Denver, CO, for Defendants–Appellees Centennial Spirit, Donald K. Bain, and Natalie Meyer.

Parsons & Funnell LLP, William H. Parsons, Denver, CO; Glenn J. Moramarco, New York, NY, for Amicus Curiae Brennan Center for Justice.

Opinion by Judge ROY.

Appellants, the League of Women Voters of Colorado, a Colorado non-profit corporation, and Colorado Common Cause, a Colorado non-profit corporation (collectively League), appeal the trial court's order affirming the administrative law judge's grant of summary judgment in favor of appellees, Donetta Davidson, Secretary of State of Colorado; and Centennial Spirit, a Colorado non-profit corporation; Donald K. Bain; and Natalie Meyer (collectively Centennial). The Brennan Center for Justice at NYU School of Law filed an amicus curiae brief in support of appellants. We affirm.

Centennial is a non-profit corporation that was organized in July 1998. Donald K. Bain was the incorporator and, during all relevant times, was its secretary/treasurer and member of the board of directors. Natalie Meyer was, at all relevant times, its president. Centennial's articles of incorporation state that the organization operates exclusively for educational purposes to generate interest in the political process and encourage Colorado citizens to vote; to educate voters on important issues facing Colorado and individual legislative records on those issues; and to educate Colorado voters with respect to the virtues of individual freedom, personal responsibility, replacement of the welfare state, creation of an opportunity society, smaller and smarter government, reduction of taxes, and the vigorous enforcement of criminal laws. Centennial's articles of incorporation expressly prohibit it from advocating the election or defeat of any candidate for public office.

At issue in this case are eight political advertisements that were produced and distributed by Centennial at a cost exceeding $686,000, and disseminated within fourteen days prior to the 1998 general election. Three of these advertisements were televised, one was broadcast over the radio, and four were mailed. The contents of these advertisements are not in dispute.

The first television advertisement concerned the gubernatorial race between Bill Owens and Gail Schoettler and addressed their respective positions on education. The voice-over stated, "Education, one of Colorado's most important issues." The scene contained Bill Owens' smiling face with his name in bold print below. The voice-over stated that Owens has a plan to improve education by allocating more money for the classroom, emphasize the three R's, reduce class size, provide merit pay increases for good teachers, make schools safer with a discipline policy, and allow teachers to control their own classrooms. The closing scene contained the "disclaimer": "PAID FOR BY CENTENNIAL SPIRIT. A COLORADO NON–PROFIT CORPORATION. THIS ADVERTISEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF ANY CANDIDATE." The final frame, in white letters against a black background, stated, "It's Colorado's Future, Your Choice."

The second television advertisement concerned the same gubernatorial race and addressed the candidates' respective positions on transportation. The opening scene showed traffic congestion, pollution, and road closure signs. The bottom half of the screen contained the disclaimer. The next scene showed an overweight highway maintenance worker attempting to read blueprints and a blurry, unflattering image of Gail Schoettler. The voice-over stated, "Gail Schoettler claims we need yet another transportation study. Two more years of debate and delay." The next scene depicted a smiling image of Bill Owens next to some comparatively fit highway workers. The voice-over stated, "Gail Schoettler's study, debate and delay; or Bill Owens' plan to fix the problem now?" The advertisement ended with the message, "It's Colorado's Future, Your Choice."

The third television advertisement concerned John Suthers, the Republican candidate for attorney general. The advertisement opened with the words, "Colorado Has a Choice ..." The voice-over stated, in part, "Our top law enforcement job takes courage and dedication to make the attorney general's office work for the people of Colorado." The next scene then showed a picture of John Suthers with the words, "John Suthers QUALIFIED DEDICATED." The voice-over then stated, "John Suthers has the courtroom experience and dedication needed to do the job right." With jail bars in the background, the voice-over stated, "John Suthers started practicing law over 21 years ago and has convicted more than 2,000 criminals in Colorado." The disclaimer then appeared on the screen, and, as the TV image faded, the advertisement concluded, "Colorado's Future, ... Your Choice."

The radio advertisement also concerned John Suther's campaign. In the background were sounds of jail cells slamming shut while the voice-over stated, in part, "John Suthers slammed the jail doors shut on more than 2,000 Colorado criminals, murderers, sex offenders, rapists and juvenile thugs.... John Suthers served eight years as the El Paso County District Attorney.... John Suthers has the courage and courtroom experience the Attorney General needs. Paid for by Centennial Spirit, a Colorado non-profit corporation. This ad is not an endorsement of any candidate."

The first mailer contained Bill Owens' photograph and the words, "This man's name is Bill Owens. He shares your frustration with the current administration's inability to solve the traffic mess ... but unlike his opponent he has a plan to fix the problem." On the second page of the mailer there was a picture of traffic congestion and the rhetorical question: "Are you sick and tired of this? Bill Owens is ... and he has a plan...." The third page of the mailer stated, "While you sit in traffic jams ... Bill Owens says we've had enough studies, enough delay, enough debate.... Gail Schoettler says study, delay, study, delay, study, delay ... then buy a train to carry cars." Underneath this language were copies of newspaper headlines addressing Bill Owens' plan to resolve the transportation problem. The other side of the page contained purported quotes from local newspaper articles concerning Gail Schoettler's plan to "study and delay." At the bottom of the page the mailer stated, "It's your choice ... Colorado's future is in your hands."

The second mailer concerned Bill Owens' and Gail Schoettler's positions on education. The first page contained a blurry picture of Gail Schoettler and the words, "Our kids are not learning to read ... clearly we need to take action!!" and "More of the same ..." In smaller print the mailer suggested that Gail Schoettler's plan concerning education was to maintain the status quo and oppose reform. The second page of the mailer contained a sharp photograph of Bill Owens' smiling face and the words, "Bill Owens has a plan to improve Education. Bill Owens and his wife Frances believe that our children are our most precious resource." In smaller print the mailer described Bill Owens' record on education reform and plan for additional reform. At the bottom of the mailer was the message, "It's your choice ... Colorado's future is in your hands."

The third mailer concerned John Suthers' candidacy. One side of the mailer contained a blurred, but smiling photograph of his opponent, Ken Salazar, and stated, in part, "Between 1985 and 1992, a Canadian Company committed one of the worst environmental crimes in Colorado History. They operated the Summittville [sic] Mine in Southern Colorado ... And the man responsible for regulating this mine ... for assuring that our streams, rivers and communities were protected ... was KEN SALAZAR. As director of the Colorado Department of Natural Resources, Ken Salazar watched as Summittville [sic] poured hundreds of millions of gallons of cyanide laced water into our streams ... So why is Ken Salazar smiling? ... BECAUSE HE NOW WANTS TO BE ATTORNEY GENERAL!" The other side of the mailer contained a clear photograph of John Suthers and pictures of laudatory newspaper headlines for his work as district attorney of El Paso County. Below the pictures, the mailer stated, "John Suthers is a respected former prosecutor who knows how to prosecute and convict criminals ... John Suthers knows crime when he sees it ... and the Summittville [sic] Mine disaster was an environmental crime ..." The mailer closed with the statement, "It's your choice ... Colorado's future is in your hands."

The fourth mailer encouraged early voting. The first page stated, "VOTE EARLY NOW! Don't let El Nino Stop You From Voting on November 3rd!" The next page contained photographs of the Republican candidates running for state and federal offices from the State of Colorado. The photographs were accompanied by the candidates' names printed below and the offices they sought. The next page stated, "HERE IS WHAT THESE CANDIDATES STAND FOR:" The following issues were bulleted: "Smaller government, Local control of education, Protecting Social Security, Reforming the Internal Revenue Service and our tax system, Responsible Stewardship of natural resources, Increase resources to fight the influx of drug use in Colorado, Equal opportunity for every individual." The mailer closed with "PLEASE make sure to Vote."

The League filed a complaint with the Secretary of State (Secretary), alleging that Centennial violated the Fair Campaign Practices Act (the Act), § 1–45–101, et seq., C.R.S.2000. The League asserted that Centennial is a "political committee" as defined by § 1–45–103(10)(a), C.R.S.2000; Centennial's advertisements were "independent expenditures" as defined by § 1–45–103(7), C.R.S.2000; and therefore Centennial was obligated, but failed, to comply with the Act's notice, registration, reporting, and disclosure requirements, as well as its contribution limits. Had the Secretary concluded that Centennial was a political committee, then the civil and criminal penalties provided by the Act could have been sought and imposed. Centennial admits that it did not comply with the Act.

Pursuant to § 1–45–111, C.R.S.2000, the Secretary appointed an administrative law judge (ALJ), who held a hearing on the matter in February 1999. Centennial filed a motion for summary judgment contending that it was not required to comply with the Act because its advertisements were "issue" advocacy, not "express" advocacy, and that to conclude otherwise would violate the First and Fourteenth Amendments. The ALJ denied this motion at the beginning of the hearing. During the hearing, the League presented an expert witness in the fields of

argumentation, language, communication, and thought. In essence, this witness testified that Centennial's advertisements expressly advocated for a candidate because they were structured as syllogisms, the most persuasive model of argumentation.

Following the hearing, the ALJ reversed her earlier ruling and granted Centennial's motion for summary judgment. In support of this ruling, the ALJ concluded that Centennial's advertisements were not subject to the Act's requirements since they did not contain any of the "magic words" set forth in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and that the evidence did not support a finding that Centennial was a "political committee." · Specifically, the ALJ concluded that:

> Centennial Spirit has utilized in its campaign advertisements words which might cause one to conclude that it is the intent of Centennial Spirit to advocate the election of a candidate. However, Centennial Spirit has done so without use of the "magic words" in order to engage in constitutionally protected issue advocacy free from regulation under the [Act].

The League appealed to the district court for review of the ALJ's decision, alleging that the "magic words" test is the incorrect legal standard, and thus, the ALJ's decision was contrary to law or, alternatively, it was arbitrary and capricious because the advertisements were "express advocacy" under even this standard. The district court affirmed.

## I. Standard of Review

■ An appellate court is in the same position as the district court in reviewing an administrative decision. In other words, the appropriate consideration for an appellate court is whether there is sufficient evidentiary support for the decision reached by the administrative tribunal, not whether there is adequate evidentiary support for the lower court's decision. C.R.C.P. 106; *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373 (Colo.2000). However, on appeal the League does not challenge the ALJ's decision on an evidentiary basis. Rather, it argues again that the ALJ utilized the incorrect legal standard in interpreting the Act. Thus, given that

the interpretation of a statute is a question of law, our review is *de novo*. Cf. *Ad Two, Inc. v. City & County of Denver*, supra (*de novo* review of administrative decision concerning the interpretation of a contract).

## II. The Act

The Act was adopted by the People of Colorado pursuant to an initiative at the general election in 1996 and became effective January 15, 1997.

The purpose of the Act is stated in § 1–45–102, C.R.S.2000, which provides:

> The people of the state of Colorado hereby find and declare that large campaign contributions to political candidates allow wealthy contributors and special interest groups to exercise a disproportionate level of influence over the political process; that large campaign contributions create the potential for corruption and the appearance of corruption; that the rising costs of campaigning for political office prevent qualified citizens from running for political office; and that the interests of the public are best served by limiting campaign contributions, encouraging voluntary campaign spending limits, full and timely disclosure of campaign contributions, and strong enforcement of campaign laws.

In an attempt to meet these goals, the Act imposes contribution limits, encourages voluntary campaign spending limits, imposes reporting and disclosure requirements, and vests initial enforcement powers with the Secretary and ultimate enforcement powers with the district attorney within a particular jurisdiction.

The penalties for a violation of the Act are both civil and criminal in nature. The Act provides that those who violate the contribution limits, as donors or recipients, may be liable to the State for twice the amount contributed or received. Section 1–45–113(2), C.R.S.2000. The Act also provides daily penalties for failure to file timely reports of contributions and expenditures. Section 1–45–113(4), C.R.S.2000.

The primary sanction for violation of the Act, however, is criminal. It is a class two misdemeanor for a person willfully and in-

tentionally to violate § 1–45–104 (contribution limits), § 1–45–105 (voluntary spending limits), § 1–45–106 (use of unexpended campaign contributions), and § 1–45–107 (independent expenditures), C.R.S.2000, or willfully and intentionally fail to disclose any contribution or expenditure on any report. A class two misdemeanor is punishable by a minimum of six months imprisonment or a fine of $500, or both, and a maximum of twelve months imprisonment or $1,000, or both. Section 18–1–106(1), C.R.S.2000.

Section 1–45–103(7), C.R.S.2000, defines "independent expenditure" as:

[The] payment of money by any person *for the purpose of advocating the election or defeat of a candidate,* which expenditure is not controlled by, or coordinated with, any candidate or any agent of such candidate. "Independent expenditure" includes expenditures for political messages which *unambiguously refer to any specific public office or candidate for such office,* but does not include expenditures made by persons, other than political parties and political committees, in the regular course and scope of their business and political messages sent solely to their members. (emphasis added)

Section 1–45–103(10)(a), C.R.S.2000, defines "political committee" as:

[T]wo or more persons who are elected, appointed, or chosen, or have associated themselves, for the purpose of making contributions to candidate committees, issue committees, political parties, or other political committees, or *for the purpose of making independent expenditures.* (emphasis added)

## III. Campaign Finance Reform Litigation

In determining the reach of the Act concerning "political committees" and "independent expenditures," we next consider the federal and state case law interpreting such phrases and concepts.

### A. Federal Election Campaign Act

The seminal case in the area of campaign finance reform is *Buckley v. Valeo, supra.* In *Buckley,* candidates for federal office and various political committees and organizations brought a declaratory judgment action challenging the constitutionality of the Federal Election Campaign Act of 1971 (FECA). Like the Act, as pertinent here, FECA limited contributions, limited independent expenditures, required disclosure and record keeping, and required disclosure of persons making independent contributions and expenditures. In recognizing FECA's impact on First Amendment free speech rights, the Court stated:

Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people."

*Buckley, supra,* 424 U.S. at 14, 96 S.Ct. at 632, 46 L.Ed.2d at 685 (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)).

In light of this impact, the Supreme Court recognized that the identification and notification requirements of FECA, with respect to independent expenditures, constitute compelled disclosure that "can seriously infringe on privacy of association and belief guaranteed by the First Amendment" and potentially chill political free speech. *Buckley, supra,* 424 U.S. at 64, 96 S.Ct. at 656, 46 L.Ed.2d at 713.

In order to satisfy the seemingly incompatible goals of protecting political speech while giving effect to the FECA, the Court held that both 18 U.S.C. § 608(e), which limits independent expenditures by a person "relative to a clearly identified candidate," and 2 U.S.C. § 434(e), which requires reporting of independent political expenditures, must be narrowly construed to avoid vagueness and overbreadth problems. Thus, the Court held that these two sections of the FECA only apply to funds used for communications that "expressly advocate" the election or defeat of a candidate. The Court stated:

We agree that in order to preserve the provision against invalidation on vagueness

grounds, § 608(e)(1) must be construed to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office. **n52**

*Buckley, supra,* 424 U.S. at 44, 96 S.Ct. at 646, 46 L.Ed.2d at 702 (emphasis added).

Footnote 52, which has been the focus of considerable subsequent attention and is emphasized above, provided a list of words or phrases that would constitute "express advocacy":

> This construction would restrict the application of § 608(e)(1) to communications containing express words of advocacy of election or defeat, *such as* "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," "reject."

*Buckley, supra* (fn.52) (emphasis added).

The Court, having previously approved direct contribution and expenditure limitations applicable to candidates for federal office, then explained that the legitimate governmental interest in regulating campaign contributions and expenditures was considerably diminished when it came to independent expenditures. The Court stated:

> We find that the governmental interest in preventing corruption and the appearance of corruption is inadequate to justify § 608(e)(1)'s ceiling on independent expenditures.... Unlike the contribution limitations' total ban on the giving of large amounts of money to candidates, § 608(e)(1) prevents only some large expenditures....
>
> Second, ... the independent advocacy restricted by the provision does not presently appear to pose dangers of real or apparent corruption comparable to those identified with large campaign contributions. The parties defending § 608(e)(1) contend that it is necessary to prevent would-be contributors from avoiding the contribution limitations by the simple expedient of paying directly for media advertisements or for other portions of the candidate's campaign activities....
>
> Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate. Rather than preventing circumvention of the contribution limitations, § 608(e)(1) severely restricts all independent advocacy despite its substantially diminished potential for abuse.

*Buckley, supra,* 424 U.S. at 45–47, 96 S.Ct. at 647–48, 46 L.Ed.2d at 702–04.

The Supreme Court revisited the issue of campaign finance reform in *Federal Election Commission v. Massachusetts Citizens for Life,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (*MCFL*). In *MCFL*, the organization engaged in diverse educational and legislative activities relating to abortion and euthanasia. It published a newsletter that it distributed on an irregular basis to its members and contributors. However, in the fall of 1978, it published a special edition of the newsletter, which it disseminated on a much broader basis by mailing to those it deemed sympathetic to its position. The newsletter contained the phrases, "EVERYTHING YOU NEED TO KNOW TO VOTE PRO–LIFE" and "VOTE PRO–LIFE." The newsletter also listed all state and federal candidates for public office and identified them as either supporting or opposing the organization's position and additionally contained the photographs of thirteen candidates who were identified as particularly supportive of the organization's pro-life position. The Supreme Court concluded that the newsletter was "express advocacy" for the election of the favored candidates, and, in so doing, referred back to the *Buckley* test, by stating:

> *Buckley* adopted the "express advocacy" requirement to distinguish discussion of issues and candidates from more pointed exhortations to vote for particular persons. We therefore concluded in that case that a finding of "express advocacy" depended upon the use of language such as "vote for," "elect," "support," etc.... Just such

an exhortation appears in the "Special Edition." The publication not only urges voters to vote for "pro-life" candidates, but also identifies and provides photographs of specific candidates fitting that description.

*MCFL,* 479 U.S. at 249, 107 S.Ct. at 623, 93 L.Ed.2d at 551 (citation omitted).

Subsequent to *MCFL,* the Ninth Circuit Court of Appeals decided *Federal Election Commission v. Furgatch,* 807 F.2d 857 (9th Cir.1987), in which it adopted a context-based analysis for determining whether a political advertisement or circular amounts to express advocacy. *Cf. Federal Election Commission v. Christian Coalition,* 52 F.Supp.2d 45 (D.D.C.1999)(exact standard applied in this case is unclear).

In *Furgatch,* the court was asked to determine whether a full page advertisement that was captioned, "DON'T LET HIM DO IT," which ran one week prior to the 1980 presidential election, was "express advocacy." Having rejected a "magic words" standard, the court attempted to balance free speech concerns against campaign finance reform by developing a three-part standard for determining whether a communication is "express advocacy":

> [T]o be express advocacy ... it must, when read as a whole, and with limited reference to external events, be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate. This standard can be broken into three main components. First, even if it is not presented in the clearest, most explicit language, speech is "express" for present purposes if its message is unmistakable and unambiguous, suggestive of only one plausible meaning. Second, speech may only be termed "advocacy" if it presents a clear plea for action, and thus speech that is merely informative is not covered by [FECA]. Finally, it must be clear what action is advocated. Speech cannot be "express advocacy of the election or defeat of a clearly identified candidate" when reasonable minds could differ as to whether it encourages a vote for or against a candidate or encourages the reader to take some other kind of action.

*Furgatch, supra,* 807 F.2d at 864. In support of this standard, the court noted that "context is one of the crucial factors" that is considered when determining whether other forms of free speech can be regulated. *Furgatch, supra,* 807 F.2d at 863.

## B. Fair Campaign Practices Act

To date, courts considering the Act have construed it narrowly. Thus, in *Common Sense Alliance v. Davidson,* 995 P.2d 748 (Colo.2000), an unincorporated association of persons engaged in political educational activities, endorsed candidates for local office, and had taken positions on local government issues. In 1996, the association opposed a light rail proposal for the Roaring Fork Valley and placed its own transportation proposal on the ballot and supported it. The county attorney filed an administrative complaint, which, as here, was referred to an ALJ. The ALJ concluded that, as of July 20, 1998, when the association began accepting contributions and making expenditures to support its ballot proposal and oppose the county's ballot proposal, it became an issue committee under the Act and was, in turn, subject to the Act's registration and reporting requirements. The association commenced a proceeding in the federal district court seeking declaratory relief, and that court propounded interrogatories to the Colorado Supreme Court. The first interrogatory was whether an organization, which was formed and operated for purposes other than being an issue committee under the Act, becomes an issue committee if it begins to accept contributions and make expenditures to support or oppose a ballot issue or question. The supreme court answered the question in the negative, and therefore did not address the second and third interrogatories, which concerned when such an organization becomes an issue committee and whether full or partial disclosure is warranted.

The Colorado Supreme Court reached this decision by narrowly or strictly construing the definition of "issue committee." That definition required that the committee be formed "for the purpose of accepting contributions and making expenditures to support or oppose any ballot issue or ballot question." Section 1–45–103(8), C.R.S.2000. Therefore,

a committee with a history of other purposes did not become an issue committee merely because it collected contributions and made expenditures in support of a ballot issue. The court recognized that a broad reading of the definition would subject a multi-faceted organization to the Act's requirements based on only one of its activities or purposes.

With respect to the constitutional issues impacting the regulation of issue committees, the court stated, in dicta, that contributions by individuals to issue committees are a very significant form of political expression and that the right of free association is necessarily implicated whenever an individual's membership and contributions are subject to public disclosure. The court indicated that specificity was required as to the circumstances under which disclosure is, or becomes, required for both First and Fifth Amendment purposes. *Common Sense Alliance v. Davidson, supra.*

In *Citizens for Responsible Government State Political Action Committee v. Davidson,* 236 F.3d 1174 (10th Cir.2000), the court dealt with several consolidated declaratory judgment actions brought by individuals and organizations engaged in political activity for a determination of the applicability of the Act to them or their activities.

The cases raised, inter alia, the constitutionality or applicability of § 1–45–103(7)(definition of independent expenditure), § 1–45–103(10)(a)(definition of political committee), and § 1–45–103(11)(definition of political message). These terms are interrelated. That is, a "political committee" is formed to, inter alia, make "independent expenditures" which include expenditures for "political messages." Section 1–45–103(10)(a). The definition of "independent expenditures" states that this term includes the "payment of money ... for the purpose of advocating the election or defeat of a candidate," and also includes "expenditures for political messages which unambiguously refer to any specific public office or candidate for such office." Section 1–45–103(7). The definition of "political message" includes "a message ... which advocates the election or defeat of any candidate or which unambiguously refers to such candidate." Section 1–45–103(11).

Relying on the rationale of *Buckley* and *MCFL,* the court held that communications that do not contain express words advocating the election or defeat of a particular candidate are constitutionally protected issue advocacy. The court then concluded that:

> The phrases "which unambiguously refer to any specific public office or candidate for such office" in § 103(7), and "or unambiguously refers to such candidate" in § 103(11), each extend the reach of the [Act's] substantive provisions "to advocacy with respect to public issues, which is a violation of the rule enunciated in *Buckley* and its progeny."

*Citizens for Responsible Government State Political Action Committee v. Davidson, supra,* 236 F.3d at 1193–94 (quoting *Vermont Right to Life Committee, Inc. v. Sorrell,* 221 F.3d 376, 387 (2d Cir.2000)).

## IV. Due Process

As noted, the primary sanction for the violation of the Act is criminal. Therefore, the Act must not only be constitutional for purposes of free speech and association under the First Amendment, it must also pass constitutional muster under the Fifth and Fourteenth Amendments.

 A criminal statute is unconstitutional if it is so vague that it leaves the public uncertain as to what conduct it prohibits. "Engrained in our concept of due process is the requirement of notice." *People v. Holmes,* 959 P.2d 406, 414 (Colo.1998)(quoting *Lambert v. California,* 355 U.S. 225, 228, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957)).

Consequently, a criminal statute may violate the due process clauses of the Fifth and Fourteenth Amendments and article II, § 25 of the Colorado Constitution where it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *City of Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999); *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *People v. Holmes, supra.*

Conversely, a statute satisfies the requirements of due process if it provides fair notice of the conduct that has been deemed unlawful. *Smith v. Charnes*, 728 P.2d 1287 (Colo.1986). A criminal statute need not contain precise definitions of every word or phrase constituting an element of the offense to be deemed fair notice. *People v. Schoondermark*, 699 P.2d 411 (Colo.1985). In other words, due process does not require "mathematical exactitude in legislative draftsmanship," *People ex rel. City of Arvada v. Nissen*, 650 P.2d 547, 550 (Colo.1982), since it must be sufficiently specific to give fair warning of the proscribed conduct and, at the same time, it must remain sufficiently general to address the essential problem under varied circumstances. *See, e.g., People v. Aalbu*, 696 P.2d 796 (Colo.1985); *People v. Sequin*, 199 Colo. 381, 388, 609 P.2d 622, 627 (1980)("The vagueness test is not an exercise in semantics to emasculate legislation; rather, it is a pragmatic test to ensure fairness.").

With these principles in mind, we address the contentions of the parties.

## V. Analysis

The League asserts that the ALJ erred in applying the "magic words" test, that is, in concluding that the advertisements do not constitute express advocacy because they do not use any of the precise words or phrases specifically set forth in *Buckley v. Valeo, supra.* We find no reversible error.

## A. Political Committee

At the outset, we address the argument of the Secretary that Centennial is not a political committee as a matter of law pursuant to the statutory definition of § 1–45–103(10)(a) and the rationale of *Common Sense Alliance v. Davidson, supra*, which narrowly construed the definition of "issue committee." We disagree.

More specifically, the Secretary argues that, because being a "political committee" is not a stated purpose in Centennial's articles of incorporation, it cannot be a "political committee." Under this approach, an organization's representations contained in its initial incorporating documents would be

the sole determinative factor concerning whether it is or is not a "political committee." The Secretary urges that *Common Sense Alliance* so holds. We believe the Secretary reads both the statute and the case too narrowly.

In *Common Sense Alliance*, the supreme court did not base its analysis solely on the stated purposes of the organization. Instead, it pointed out that the organization there had engaged in educational and other activities outside the definition of "issue committee" for several years before it proposed and supported a ballot initiative. In addition, the question before the court was not whether the organization was an "issue committee," but whether such an organization formed for other purposes could, by supporting a ballot initiative, later become an "issue committee."

Centennial was formed in July 1998, or about four months prior to the 1998 general election. Counsel for Centennial, in oral argument, stated that Centennial had never engaged in any activities other than soliciting contributions for the advertisements at issue here, either before or after the 1998 election.

While the stated purposes for the formation of the organization may be one criterion upon which to determine whether it is a "political committee," they are not conclusive. To so hold would permit regulable conduct to escape regulation merely because the stated purposes were misleading, ambiguous, fraudulent, or all three. In addition, such a holding would exalt form over substance and would almost entirely eviscerate the Act and make a mockery of a legitimate attempt at campaign finance reform.

We reject the Secretary's parallel argument that this case is moot, for the same reasons.

## B. Express Advocacy

The League argues that the three-part context-based analysis of *Federal Election Commission v. Furgatch, supra*, is the appropriate analysis for determining whether a communication is "express advocacy." We are not persuaded.

This approach calls first for a determination of whether the communication is "express," that is, even though the language is not the clearest and most explicit, it is unmistakable, unambiguous, and suggestive of only one meaning. Second, it must be determined whether the communication is "advocacy," that is, the action that is advocated is clear. Finally, third, it must be determined whether reasonable minds can differ as to whether the communication encourages a vote for, or against, a candidate or encourages some other action.

This approach has some initial attraction because it finds support in the definition of "independent expenditure," which contains the phrase "unambiguously refer[s] to any specific public office or candidate for such office." However, this language was declared unconstitutional in *Citizens for Responsible Government State Political Action Committee v. Davidson, supra,* because it extended the reach of the Act beyond that which is allowed by *Buckley v. Valeo, supra,* and its progeny.

Additionally, while this analysis creates a comparatively evenly balanced approach to the tension between campaign finance reform and First Amendment concerns, it has been severely criticized for several reasons. First, it clearly raises both vagueness and overbreadth problems. In fact, in *Elections Board v. Wisconsin Manufacturing & Commerce,* 227 Wis.2d 650, 597 N.W.2d 721 (1999), the supreme court of Wisconsin noted the attraction of this standard, but declined to apply it based on potential due process notice violations. Second, this analysis is particularly troubling when, as here, criminal penalties are implicated. *Cf. State ex rel. Crumpton v. Keisling,* 160 Or.App. 406, 982 P.2d 3 (1999) (court adopted context-based standard for expenditure requirements, the violation of which does not implicate criminal penalties). Third, this analysis is extremely difficult to apply, in that it requires courts to engage in a semiotic analysis of intent and interpretation, and, if the communication is visual, it requires courts to engage in an iconographic analysis of imagery. Additionally, depending on the timing of the communication, "what is issue advoca-

cy a year before the election may become express advocacy on the eve of the election and the speaker must continually re-evaluate his or her words as the election approaches." *See Maine Right to Life Committee, Inc. v. Federal Election Commission,* 914 F.Supp. 8, 13 (D.Maine), *aff'd,* 98 F.3d 1 (1st Cir. 1996). Fourth, this analysis is not supported by the plain language in *Buckley,* which focuses on express words of advocacy, not express images, symbols, or contexts of advocacy. *See Federal Election Commission v. Christian Action Network, Inc.,* 110 F.3d 1049 (4th Cir.1997); *see also Citizens for Responsible Government State Political Action Committee v. Davidson, supra.* Fifth, this analysis is not supported by the Supreme Court's latest pronouncement on *Buckley,* in which the Court reiterated that "exacting scrutiny" is necessary when compelled disclosure of campaign-related payments is at issue. *See Buckley v. American Constitutional Law Foundation,* 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). Finally, it is at odds with the narrow and cautious approach of the supreme court in *Common Sense Alliance v. Davidson, supra.* Therefore, we reject appellants' assertion that we should adopt the context-based standard of *Federal Election Commission v. Furgatch, supra,* or any comparable approach.

In contrast, the "magic words" test based on *Buckley v. Valeo, supra,* adopted by the ALJ, which is a narrow or strict interpretation of *Buckley,* is appealing for a variety of reasons. First, it affords the greatest First Amendment protection for the most cherished form of free speech, political speech: "debate on public issues should be uninhibited, robust, and wide-open." *Buckley, supra,* 424 U.S. at 14, 96 S.Ct. at 632, 46 L.Ed.2d at 685 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Second, such an interpretation provides clear notice regarding what is and what is not subject to regulation and is arguably quite resilient for due process purposes. Finally, it is remarkably easy to apply since it is objective and requires no exercise of discretion, sophisticated analysis, or judgment call.

However, this interpretation also suffers from significant infirmities. It strains the court's holding in *Buckley* because it places great emphasis on a footnote and ignores both the textual context and the phrase "such as," which clearly implies that the listed words and phrases constitute an exemplary, not exclusive, list.

For these, and additional reasons, other tribunals have rejected such a narrow interpretation of *Buckley*. As stated in *Elections Board v. Wisconsin Manufacturers & Commerce, supra*, 597 N.W.2d at 730:

> We do not read Buckley and MCFL as requiring that a communication contain any specific "magic words" in order to constitute express advocacy. The words listed in footnote 52 of Buckley are merely examples of words which undoubtedly constitute "express words of advocacy of election or defeat," as evidenced by the Court's use of the phrase "such as" immediately preceding the list of words....
>
> Further, it would be absurd to hold that those particular "magic words" of advocacy which the Buckley Court chose to mention in footnote 52 qualify as express advocacy while other, equally explicit words of advocacy do not. We can think of no reason to adopt an approach which would regulate an ad which said, "Defeat Smith," but not an ad which said, "Unseat Smith."

*See also Federal Election Commission v. Christian Action Network Inc., supra; Federal Election Commission v. Furgatch, supra.* In addition, in *MCFL* the Supreme Court, in our view, implicitly rejected such a narrow interpretation of *Buckley.*

■ A third analysis, and the one with which we agree, permits the regulation of only those expenditures that are used for communications that "expressly advocate the election or defeat of a clearly identified candidate." *See Buckley v. Valeo, supra*, 424 U.S. at 80, 96 S.Ct. at 664, 46 L.Ed.2d at 723. In other words, this standard includes the use of the words and phrases listed in *Buckley* and other substantially similar or synonymous words.

This analysis was used in *Elections Board v. Wisconsin Manufacturers & Commerce, supra; Federal Election Commission v.* *Christian Action Network, Inc., supra;* and *Vermont Right to Life Committee, Inc. v. Sorrell, supra.*

Additionally, this analysis does not ignore the plain language of both the text and footnote in *Buckley*. In addition, it is compatible with the Supreme Court's reasoning in *MCFL.*

Unlike the broad context-based approach, this approach remains focused on actual words, not images, symbols, or other contextual factors. *See Federal Election Commission v. Christian Action Network, Inc., supra.* Moreover, we are satisfied that this approach, while not providing precise notice of what is and is not "express advocacy," does provide notice which is considerably superior to that afforded by the context-based analysis of *Federal Election Commission v. Furgatch, supra*, and, while it must await a case-by-case determination, we are also satisfied that it provides adequate notice in light of due process concerns. *See Buckley v. Valeo, supra; cf. State ex rel. Crumpton v. Keisling, supra.* Most importantly, while we realize that this approach permits the relatively easy circumvention of the Act, it strikes an appropriate balance between trying to preserve the goals of campaign finance reform and, at the same time, protect political speech.

Having so concluded, we now turn to the advertisements in question. The issue is whether any of the advertisements contained words listed in *Buckley* or substantially similar words expressly advocating the election or defeat of an identified candidate. We conclude that they did not.

■ The only advertisement that comes close to being express advocacy is the last leaflet, which was mailed to voters. It contains photographs of all of the major Republican candidates for state and federal office, that is, U.S. Senator, House of Representatives, Governor, Lieutenant Governor, Attorney General, Secretary of State, Treasurer, with their names. Also listed but without an accompanying photograph was the Regent of the University of Colorado. In this sense the leaflet is similar to the leaflet in *MCFL* that the Supreme Court concluded was express

advocacy. The leaflet at issue here then stated: "Here is What These Candidates Stand For:" followed by seven bulleted political positions, such as smaller government and local control of education. The statement of positions or philosophies was followed by the request, "Please make sure to Vote!" The leaflet does not expressly ask voters to vote for the identified candidates. In addition, and unlike the leaflet in *MCFL*, it does not ask the voter to support the stated political positions or philosophies and vote accordingly. Thus, we conclude that the last leaflet at issue here, unlike *MCFL*, was not "express advocacy" and consequently did not implicate the Act.

█ While the other seven advertisements identify candidates, they do not explicitly urge a vote for the identified candidate. Rather, they favorably present the candidate's position on issues and experience, or unfavorably present the positions and experience of the other candidate, or both.

Thus, we conclude that none of Centennial's advertisements was "express advocacy," as that term is construed and applied in *Buckley v. Valeo, supra,* and its progeny, and, therefore, Centennial was not subject to the requirements of the Act.

We recognize that our conclusion may limit the regulation of independent campaign expenditures. We also recognize that the ability to favorably present a candidate to the electorate, or unfavorably present an opponent to the electorate, is widely believed to affect the outcome of elections. Nevertheless, the First Amendment's guarantee of free speech and association necessarily limits the regulation of political speech.

Given that the district court and the ALJ reached the correct conclusion under an unduly restrictive standard, we affirm the judgment. *See H.M.O. Systems, Inc. v. Choicecare Health Services, Inc.,* 665 P.2d 635 (Colo.App.1983).

Judgment affirmed.

ROTHENBERG and TAUBMAN, JJ., concur.