**COLORADO ETHICS WATCH,**
Petitioner–Appellant and
Cross–Appellee,

v.

**SENATE MAJORITY FUND, LLC,**
Respondent–Appellee and
Cross–Appellant,

and

**Colorado Leadership Fund, LLC,**
Respondent–Appellee,

and

**Office of Administrative Courts, Appellee.**

Nos. 08CA2689, 09CA0384.

Colorado Court of Appeals,
Div. II.

March 18, 2010.

Luis Toro, Chantell Taylor, Denver, Colorado, for Petitioner–Appellant and Cross–Appellee.

Hackstaff Gessler LLC, Scott E. Gessler, Mario D. Nicolais, II, Denver, Colorado, for Respondent–Appellee and Cross–Appellant Senate Majority Fund, LLC.

Brownstein Hyatt Farber Schreck, LLC, Jason R. Dunn, Denver, Colorado, for Respondent–Appellee Colorado Leadership Fund, LLC.

No Appearance for Appellee.

Opinion by Judge GABRIEL.

This case requires us to determine the meaning of "expressly advocating the election or defeat of a candidate," as that phrase is used within the definition of "expenditure" contained in article XXVIII, section 2(8) of the Colorado Constitution. Petitioner, Colorado Ethics Watch (Ethics Watch), contends that "expressly advocating" encompasses more than just advertisements using the so-called "magic words" of electoral advocacy delineated in *Buckley v. Valeo,* 424 U.S. 1, 44 n. 52, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and their synonyms. Ethics Watch argues instead that "expressly advocating" encompasses campaign advertisements that are the functional equivalent of express advocacy. From this premise, it asserts that certain campaign advertisements placed by respondents, Senate Majority Fund, LLC (SMF) and Colorado Leadership Fund, LLC (CLF), during the 2008 election cycle amounted to "expressly advocating" and were subject to regulation under article XXVIII. Respondents disagree.

Addressing a matter of first impression, we conclude that "expressly advocating the election or defeat of a candidate," as that phrase is used in the definition of "expenditures" in the Colorado Constitution, encompasses only communications using the so-called "magic words" of *Buckley,* 424 U.S. at 44 n. 52, 96 S.Ct. 612, and words substantially similar or synonymous thereto, and requires an express exhortation that the reader, viewer, or listener take action to elect or defeat a candidate. Applying this construction here, we affirm the administrative law judge's (ALJ's) order dismissing Ethics Watch's complaint against respondents.

## I. Factual Background

Respondents are both so-called "527" tax-exempt political organizations, registered with the Internal Revenue Service pursuant to 26 U.S.C. § 527 (2009). During the 2008 election cycle, respondents each paid for and distributed a series of print advertisements discussing certain candidates for the state legislature. SMF also produced and aired television advertisements. In general, these advertisements indicated that the candidates were running for office, discussed the candidates' qualifications, and encouraged voters to call the candidates to thank them for their work on particular issues. Both respondents filed reports as 527 political organizations with the Colorado Secretary of State.

In September 2008, Ethics Watch filed a complaint with the secretary of state, alleging that both respondents had violated Colorado's campaign finance laws. Specifically, Ethics Watch alleged that respondents had engaged in advertising for the purpose of expressly advocating the election of certain candidates. Ethics Watch contended that this rendered both organizations "political committees" pursuant to article XXVIII, section 2(12)(a) of the Colorado Constitution and section 1–45–103(14), C.R.S.2009. Accordingly, Ethics Watch claimed that respondents were required (1) to register as political committees with the secretary of state, (1) to comply with certain restrictions as to the amount of contributions that they could accept, and (3) to file certain independent expenditure reports. Ethics Watch alleged that respondents violated each of these requirements and requested that they be fined for such violations.

Respondents denied all of Ethics Watch's allegations and moved to dismiss the complaint.

In a detailed and thorough order, the ALJ granted respondents' motion to dismiss, finding that the advertisements in question did not constitute "express advocacy" as the ALJ construed that phrase. Accordingly, the ALJ concluded that the advertisements did not subject respondents to regulation as political committees, as Ethics Watch contended.

Thereafter, SMF filed a motion for attorney fees pursuant to section 1–45–111.5, C.R.S.2009, and C.R.C.P. 11, arguing that Ethics Watch's complaint was frivolous and vexatious. CLF initially joined in that motion but later withdrew its fee request. The ALJ concluded that Ethics Watch's complaint was not substantially frivolous, groundless, or vexatious and denied SMF's motion.

Ethics Watch now appeals the dismissal of its complaint against respondents, and SMF cross-appeals the denial of its request for attorney fees.

## II. *Citizens United v. Federal Election Commission*

As a preliminary matter, we note that we ordered the parties here to submit supplemental briefs addressing the impact, if any, of the United States Supreme Court's recent decision in *Citizens United v. Federal Election Commission*, —— U.S. ——, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). Although each of the parties asserts that *Citizens United* supports its arguments in this appeal, none of the parties asserts that the Supreme Court's decision affects the constitutionality of the provisions now before us. Nor do we perceive *Citizens United* as calling into question those provisions. Accordingly, we proceed to the issues presented here.

## III. Campaign Finance Laws

In order to construe the phrase "expressly advocating," as it is used in article XXVIII, section 2(8) of the Colorado Constitution, we first review the federal and state campaign finance laws that led to the 2002 adoption of article XXVIII by the people of Colorado.

### A. Federal Campaign Finance Law

In the landmark campaign finance case of *Buckley v. Valeo,* 424 U.S. at 6, 96 S.Ct. 612, the United States Supreme Court was asked to review the constitutionality of certain provisions of the Federal Election Campaign Act of 1971 (FECA), 2 U.S.C. §§ 431 to 457 (1970 ed., Supp. IV). Congress had passed FECA and various amendments thereto to address perceived problems inherent in political campaign financing and to promote full

disclosure of campaign-oriented spending, "to insure both the reality and the appearance of the purity and openness of the federal election process." *Id.* at 78, 96 S.Ct. 612. Toward that end, FECA imposed broad restrictions on political contributions and expenditures, as well as certain reporting and disclosure requirements. *Id.* at 7, 12–13, 96 S.Ct. 612. For example, FECA prohibited any person from making any expenditure "relative to a clearly identified candidate during a calendar year which, when added to all other expenditures made by such person during the year advocating the election or defeat of such candidate, exceeds $1,000." *Id.* at 39, 96 S.Ct. 612. The *Buckley* plaintiffs challenged FECA's various limitations and reporting and disclosure requirements on First Amendment grounds, asserting, among other things, that these requirements were unconstitutionally vague. *Id.* at 11, 40, 96 S.Ct. 612.

As pertinent here, in order to avoid invalidating FECA's expenditure limits on vagueness grounds, the Court interpreted the above-quoted provision to apply only to "expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." *Id.* at 44, 96 S.Ct. 612. The Court then stated in a now-famous footnote, "This construction would restrict the application of [the above-quoted provision] to communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Id.* at 44 n. 52, 96 S.Ct. 612. These examples eventually gave rise to what is now known as the "magic words" requirement. *See, e.g.,* *McConnell v. Federal Election Comm'n,* 540 U.S. 93, 191, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (plurality opinion), *overruled in part by Citizens United v. Federal Election Comm'n,* — U.S. ——, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). Notwithstanding this narrow reading of the independent expenditure provision, however, the *Buckley* Court concluded that the government's interest in preventing corruption and the appearance of corruption was inadequate to justify that provision's ceiling on independent expenditures and thus invalidated it on First Amendment

grounds. *Buckley,* 424 U.S. at 45, 96 S.Ct. 612.

The *Buckley* Court proceeded to discuss certain disclosure requirements included in FECA. *Id.* at 60–85, 96 S.Ct. 612. To ensure that the reach of the disclosure requirements at issue was not impermissibly broad, the Court employed the same construction of "express advocacy" in the disclosure context as it had employed in the context of expenditures, specifically referring back to the "magic words." *Id.* at 80 & n. 108, 96 S.Ct. 612.

As a result of the *Buckley* Court's strict reading of the above-described provisions of FECA, the use or omission of the so-called "magic words" came to be viewed as marking a bright statutory line separating "express advocacy," which could properly be regulated, and "issue advocacy" (i.e., communications regarding issues, as opposed to candidates), which could not. *McConnell,* 540 U.S. at 126, 124 S.Ct. 619.

Ultimately, however, the "magic words" test proved to be, in the words of five members of the Supreme Court, "functionally meaningless. Not only [could] advertisers easily evade the line by eschewing the use of magic words, but they would seldom choose to use such words even if permitted." *McConnell,* 540 U.S. at 193, 124 S.Ct. 619 (citations omitted). "Little difference existed, for example, between an ad that urged viewers to 'vote against Jane Doe' and one that condemned Jane Doe's record on a particular issue before exhorting viewers to 'call Jane Doe and tell her what you think.'" *Id.* at 126–27, 124 S.Ct. 619. In addition, there was evidence that candidates and officeholders were fully informed as to who was running these "issue advertisements" on their behalf. *Id.* at 128–29, 124 S.Ct. 619. Indeed, evidence showed that candidates and officeholders sometimes even suggested that donors make contributions to interest groups that were running such advertisements. *Id.*

Concerned, in part, about this proliferation of "issue advertising" in the wake of *Buckley,* Congress passed the Bipartisan Campaign Finance Reform Act of 2002 (BCRA), 2 U.S.C. §§ 431–57 (2009). *Id.* at 132, 124 S.Ct. 619. As pertinent here, section 201 of

BCRA sought to address the concern that issue advertisements were being used to circumvent the limits on independent expenditures. It did so by introducing the concept of "electioneering communications," which would then be regulated. "Electioneering communications" were defined as:

any broadcast, cable, or satellite communication which—

(I) refers to a clearly identified candidate for Federal office;

(II) is made within—

(aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or

(bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and

(III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

2 U.S.C. § 434(f)(3)(A)(i).

This provision of BCRA was challenged on constitutional grounds in *McConnell v. Federal Election Commission*, 540 U.S. at 189, 124 S.Ct. 619. Specifically, the plaintiffs in that case sued the Federal Election Commission, arguing, among other things, that section 201 of BCRA, on its face, violated the First Amendment. *Id.* at 190, 124 S.Ct. 619. In particular, the plaintiffs argued that "the justifications that adequately support the regulation of express advocacy do not apply to significant quantities of speech encompassed by the definition of electioneering communications." *Id.* at 205–06, 124 S.Ct. 619.

Five members of the Supreme Court rejected the plaintiffs' argument and upheld the facial constitutionality of section 201 of BCRA. *Id.* at 206, 124 S.Ct. 619. A plurality of the Court opined:

[The plaintiffs'] argument fails to the extent that the issue ads broadcast during the 30–and 60–day periods preceding federal primary and general elections are the functional equivalent of express advocacy. The justifications for the regulation of ex-

press advocacy apply equally to ads aired during those periods if the ads are intended to influence the voters' decisions and have that effect.

*Id.* In other words, the plurality concluded that section 201 was constitutional and not overbroad, even though it regulated, during the electioneering period, both express advocacy and issue advocacy identifying specific candidates, as long as the speech in question was the functional equivalent of express advocacy.

Several years later, in *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (plurality opinion), the Court was again asked to consider the constitutionality of the electioneering communications provision of BCRA, this time in an as-applied challenge. In that case, Wisconsin Right to Life (WRTL) intended to run certain advertisements that would have come within the definition of "electioneering communications" and thus would have been unlawful under BCRA. *Id.* at 460, 127 S.Ct. 2652. These advertisements were directed toward stopping several United States Senators from filibustering to delay or block judicial nominees. *Id.* at 458–59, 127 S.Ct. 2652. WRTL argued that BCRA's prohibition of the use of corporate treasury funds for such electioneering communications was unconstitutional as applied to it and sought appropriate declaratory and injunctive relief. *Id.*

Five members of the Supreme Court agreed with WRTL and sustained WRTL's as-applied challenge to BCRA. *Id.* at 481, 127 S.Ct. 2652. In the lead opinion, authored by Chief Justice Roberts and joined by Justice Alito, with three other members of the Court concurring in the judgment only, the Chief Justice read *McConnell* as restricting the regulation of electioneering communications to those that either constituted express advocacy or were the "functional equivalent of express advocacy." *Id.* at 478, 127 S.Ct. 2652. An advertisement was the functional equivalent of express advocacy, the Chief Justice concluded, "only if the ad [was] susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 469–70, 127 S.Ct.

2652. The Chief Justice further observed that any doubt as to whether an advertisement is express advocacy or not must be resolved in favor of protecting rather than stifling speech. *Id.* at 469, 127 S.Ct. 2652. Applying these principles, the Chief Justice then opined that, because WRTL's advertisements could reasonably be interpreted as something other than an appeal to vote for or against a specific candidate, namely, as pure issue advocacy, and because none of the compelling interests that supported the regulation of express advocacy or the functional equivalent thereof applied to such advertisements, the anti-filibuster advertisements at issue could not constitutionally be regulated. *Id.* at 476–81, 127 S.Ct. 2652.

Finally, in *Citizens United v. Federal Election Commission,* 130 S.Ct. at 876, the Supreme Court considered whether section 203 of BCRA could constitutionally be applied to prohibit corporations and unions from using their general treasury funds to make independent expenditures for speech that expressly advocates the election or defeat of a candidate or that is an electioneering communication, as defined in the statute. The Court struck down that portion of BCRA barring the expenditures by corporations and unions, *see id.* at 909, a restriction that is not at issue in the case before us. As pertinent here, however, the Court found that the documentary at issue constituted an electioneering communication and then reiterated the functional equivalency standard that it had applied to such communications in *McConnell* and *Wisconsin Right to Life. See id.* at 964. Accordingly, in our view, *Citizens United* did not alter the "magic words" standard for express advocacy, nor did it mark a departure from those portions of *McConnell* and *Wisconsin Right to Life* limiting the permissible regulation of electioneering communications that specifically identify candidates for office.

### B. Colorado Campaign Finance Law

The history of campaign finance reform in Colorado, in many ways, has mirrored the above-described history of federal campaign finance reform. Thus, in 1974, the General Assembly enacted what has come to be known as the Fair Campaign Practices Act (FCPA), ch. 57, sec. 1, §§ 49–27–101 to –121, 1974 Colo. Sess. Laws 261–70. Pursuant to the FCPA, as amended by voter initiative in 1996, "independent expenditure" was defined as:

> payment of money by any person for the purpose of advocating the election or defeat of a candidate, which expenditure is not controlled by, or coordinated with, any candidate or any agent of such candidate. "Independent expenditure" includes expenditures for political messages which unambiguously refer to any specific public office or candidate for such office, but does not include expenditures made by persons, other than political parties and political committees, in the regular course and scope of their business and political messages sent solely to their members.

Ballot Initiative 15, Campaign Finance, § 1–45–103(7) (effective upon governor's proclamation Jan. 15, 1997) (subsequently codified at section 1–45–103(7) until repeal in Dec. 2002).

This provision of the FCPA was challenged on First Amendment grounds in *League of Women Voters v. Davidson,* 23 P.3d 1266 (Colo.App.2001). In that case, eight political advertisements were produced and distributed by a nonprofit corporation prior to the 1998 election. *Id.* at 1267. The advertisements each discussed one of the candidates running in that election and described his or her position on an issue, sometimes in comparison with the position of the opposing candidate. *Id.* at 1268–69. None of the advertisements used any of the *Buckley* "magic words." *Id.* at 1270. The plaintiff nonetheless argued that the advertisements resulted from independent expenditures, as defined in section 1–45–103, and, therefore, were subject to regulation. *Id.* at 1269. The defendants disagreed, contending that they were not required to comply with the FCPA because their advertisements constituted issue advocacy, and not express advocacy. *Id.* The defendants argued that to conclude otherwise would violate the First and Fourteenth Amendments. *Id.*

Relying in part on the reasoning in *Buckley,* a division of this court construed "advo-

cating the election or defeat of a candidate" narrowly. *Id.* at 1277. The division thus held that this phrase encompassed "only those expenditures that are used for communications that 'expressly advocate the election or defeat of a clearly identified candidate.' In other words, this standard includes the use of the words and phrases listed in *Buckley* and other substantially similar or synonymous words." *Id.* at 1277 (quoting *Buckley*, 424 U.S. at 80, 96 S.Ct. 612). The division recognized that "this approach permit[ted] the relatively easy circumvention of the Act," but it determined that such a distinction struck "an appropriate balance between trying to preserve the goals of campaign finance reform and, at the same time, protect political speech." *Id.*

As was the case in federal elections following *Buckley*, after *League of Women Voters*, advertisers in statewide elections could easily avoid regulation of campaign advertising by simply avoiding the use of the "magic words" or words that were substantially similar to or synonymous with them. Recognizing and desiring to close this potential loophole, in much the same manner as Congress had previously sought to close the similar federal loophole, in 2002, Colorado voters amended the state constitution to add article XXVIII. The purpose for this amendment is set forth in article XXVIII, section 1, which provides, in pertinent part:

> The people of the state of Colorado hereby find and declare that large campaign contributions to political candidates create the potential for corruption and the appearance of corruption; ... that in recent years the advent of significant spending on electioneering communications, as defined herein, has frustrated the purpose of existing campaign finance requirements; that independent research has demonstrated that the vast majority of televised electioneering communications goes beyond issue discussion to express electoral advocacy; ... and that the interests of the public are best served by limiting campaign contributions, encouraging voluntary campaign spending limits, providing for full and timely disclosure of campaign contributions, independent expenditures, and funding of electioneering communications, and

strong enforcement of campaign finance requirements.

*Id.*

The biennial Bluebook, which was prepared by the General Assembly in advance of the 2002 election, further discussed the purpose for the amendment. Specifically, the Bluebook stated that the amendment was designed to regulate two types of political advertisements. Colo. Legislative Council, Research Pub. No. 502–7, 2002 Ballot Information Booklet: Analysis of Statewide Ballot Issues 4 (2002). "The first are those that are made outside the control of a candidate and that *specifically urge* the election or defeat of a candidate.... The second type of political advertisement is one that clearly refers to a candidate *without specifically urging* the election or defeat of the candidate." *Id.* at 4–5 (emphasis in original).

Consistent with the voters' stated intent, the new constitutional provision imposed various requirements and restrictions on persons making certain annual independent expenditures for the purpose of expressly advocating the defeat or election of any candidate. Colo. Const. art. XXVIII, § 5. These requirements and restrictions included various reporting and disclosure requirements. *Id.* In addition, article XXVIII limited the amount of money that a political committee could accept from any person to $500 every two years. Colo. Const. art. XXVIII, § 3(5).

Paralleling the enactment of BCRA at the federal level, the new constitutional provision also introduced to Colorado campaign finance law the concept of electioneering communications. Colo. Const. art. XXVIII, § 6. The amendment defined an "electioneering communication" as:

> any communication broadcasted by television or radio, printed in a newspaper or on a billboard, directly mailed or delivered by hand to personal residences or otherwise distributed that:
>
> (I) Unambiguously refers to any candidate; and
>
> (II) Is broadcasted, printed, mailed, delivered, or distributed within thirty days be-

fore a primary election or sixty days before a general election; and

(III) Is broadcasted to, printed in a newspaper distributed to, mailed to, delivered by hand to, or otherwise distributed to an audience that includes members of the electorate for such public office.

Colo. Const. art. XXVIII, § 2(7)(a).

Consistent with its above-described purposes, the amendment provided for the regulation of electioneering communications separate from the regulation of independent expenditures. Colo. Const. art. XXVIII, § 6(1). Under the applicable definitions, however, an advertisement that expressly advocated the election of a candidate would also qualify as an electioneering communication, if it were aired, printed, mailed, delivered, or distributed during the electioneering window. *See Colorado Citizens for Ethics in Government v. Committee for American Dream,* 187 P.3d 1207, 1214 (Colo.App.2008). Conversely, an electioneering communication would not necessarily constitute express advocacy.

In this case, we must decide whether the advertisements produced and distributed by respondents amounted to "expressly advocating the election or defeat of a candidate," as that phrase is used within the definition of "expenditure" contained in article XXVIII, section 2(8) of the Colorado Constitution, thereby subjecting respondents to the regulations and restrictions applicable to political committees making independent expenditures. *See* Colo. Const. art. XXVIII, § 2(12) (defining "political committee"). Ethics Watch argues that the ALJ erred by concluding that Colorado law defines express advocacy as the *Buckley* "magic words" and other substantially similar or synonymous words. Ethics Watch, instead, urges us to interpret "express advocacy" as encompassing all "nonissue" speech, or, alternatively, as broad enough to include communications that are the functional equivalent of express advocacy. Respondents, however, assert that article XXVIII was intended to constitutionalize the prevailing definition of express advocacy at the time of article XXVIII's passage, and that such definition was, and is,

limited, as the ALJ had determined. We agree with respondents.

## IV. Standard of Review

Motions to dismiss pursuant to C.R.C.P. 12(b)(5) test the sufficiency of the complaint. *Lobato v. State,* 218 P.3d 358, 367 (Colo. 2009). A reviewing court must accept all averments of material fact as true and view allegations in the light most favorable to the plaintiff. *Id.* The court cannot grant a motion to dismiss unless it appears beyond doubt that no set of facts can prove that the plaintiff is entitled to relief. *Id.* We review de novo a trial court's dismissal of a plaintiff's complaint for failure to state a claim. *Hamilton v. Noble Energy, Inc.,* 220 P.3d 1010, 1012 (Colo.App.2009).

In connection with our review of the dismissal order at issue, we review the ALJ's constitutional interpretation de novo. *See League of Women Voters,* 23 P.3d at 1270. "In construing a constitutional provision, our obligation is to give effect to the intent of the electorate that adopted it." *Harwood v. Senate Majority Fund, LLC,* 141 P.3d 962, 964 (Colo.App.2006). We look to the words used, reading them in context and according them their plain and ordinary meaning. *Id.* If the language is unambiguous, we must enforce it as written. *Davidson v. Sandstrom,* 83 P.3d 648, 654 (Colo. 2004).

"Language in an amendment is ambiguous if it is 'reasonably susceptible to more than one interpretation.'" *Id.* (quoting *Zaner v. City of Brighton,* 917 P.2d 280, 283 (Colo.1996)). If the language of a citizen-initiated measure is ambiguous, "a court may ascertain the intent of the voters by considering other relevant materials such as the ballot title and submission clause and the biennial 'Bluebook,' which is the analysis of ballot proposals prepared by the legislature." *In re Submission of Interrogatories on House Bill 99–1325,* 979 P.2d 549, 554 (Colo. 1999). "We consider the object to be accomplished and the mischief to be prevented by the provision." *Harwood,* 141 P.3d at 964.

## V. Expressly Advocating

██ The phrase "expressly advocating," as used in article XXVIII, section 2(8) of our state constitution, is not defined in the constitution. Nor, as this case and those that have preceded it show, is its meaning clear and unambiguous on its face. Thus, we must look to voter intent. *Submission of Interrogatories,* 979 P.2d at 554.

██ "The electorate, as well as the legislature, must be presumed to know the existing law at the time it amends or clarifies that law." *Alliance for Colorado's Families v. Gilbert,* 172 P.3d 964, 968 (Colo.App. 2007). Here, as more fully discussed above, at the time article XXVIII was passed by the voters, the definition of express advocacy appears to have been reasonably settled in federal and state case law. Thus, *Buckley* and its progeny repeatedly reaffirmed the "magic words" and their synonyms as the benchmark of express advocacy. For example, in *Federal Election Commission v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 249, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986), the Court held that a newsletter that directed readers to vote for pro-life candidates and identified and provided photographs of specific pro-life candidates, although marginally less direct than an exhortation to vote for a specific candidate, was express advocacy, because "it provide[d] in effect an explicit directive: vote for these (named) candidates." Similarly, in *League of Women Voters,* 23 P.3d at 1277, the division held that express advocacy, as defined under state law, required the use of *Buckley's* "magic words" and other substantially similar and synonymous words.

In light of the federal and state history and case law leading to the adoption of article XXVIII discussed above, we conclude that in adopting article XXVIII, the voters intended to incorporate the existing Colorado definition of express advocacy as reflected in *League of Women Voters.* Thus, we hold that express advocacy, under Colorado law, requires (1) the use of the *Buckley* "magic words" or substantially similar or synonymous words, and (2) an express exhortation that the reader, viewer, or listener take action to elect or defeat a candidate. In so holding, we reject in turn Ethics Watch's arguments that express advocacy should be defined either as communications that cannot be interpreted as issue speech, or as communications that are the functional equivalent of express advocacy.

First, Ethics Watch argues that article XXVIII of the state constitution recognizes only two categories of advertisements: issue discussion and express electoral advocacy. Therefore, it claims, if an advertisement cannot be interpreted as issue speech, then the advertisement should be considered express electoral advocacy. We disagree.

██ The language in article XXVIII and the context in which it was enacted and the above-described case law suggest that there are actually *three* types of advertising: (1) the express advocacy of the election or defeat of a candidate; (2) electioneering communications that refer to a specific candidate but that may or may not include express advocacy of the election or defeat of that candidate; and (3) pure issue advocacy. Colo. Const. art. XXVIII, § 2(7)-(8). If express advocacy were to be defined only as speech that is not issue speech, as Ethics Watch contends, then the constitutional provision at issue would be subject to the precise vagueness concerns that *Buckley* and *League of Women Voters* sought to avoid in narrowly construing that phrase. Because we must presume that Colorado voters did not intend to adopt an amendment that would have raised serious doubts as to its constitutionality, we reject such a construction. *See People v. Hernandez,* 30 Cal.4th 835, 134 Cal.Rptr.2d 602, 69 P.3d 446, 465 (2003) (in determining the scope of an initiative, court will assume that the voters intended the measure to be valid and will construe it to avoid serious doubts as to its constitutionality, if that can be done without doing violence to the reasonable meaning of the measure's language); *cf. Mesa County Bd. v. State,* 203 P.3d 519, 527 (Colo.2009) (a reviewing court must assume that the legislature intends the statutes that it adopts to be compatible with constitutional standards).

Moreover, "[c]andidates, especially incumbents, are intimately tied to public issues

involving legislative proposals and governmental actions." *Buckley*, 424 U.S. at 42, 96 S.Ct. 612. Accordingly, were we to adopt the "nonissue speech" construction that Ethics Watch proposes, our construction would create substantial uncertainty. This is because speakers would be unable to determine with assurance whether they were engaging in express advocacy if and when they mention the name of an elected official while discussing a legislative issue.

Second, to the extent that Ethics Watch asks us to adopt the "functional equivalent" test discussed in *McConnell* and *WRTL*, we are unpersuaded because, in our view, Ethics Watch misreads the cases on which it relies. As noted above, in *McConnell*, 540 U.S. at 205–06, 124 S.Ct. 619, a plurality of the Supreme Court discussed the concept of the functional equivalent of express advocacy in the context of electioneering communications. Specifically, the Court was responding to an argument made by the plaintiffs in that case that "the justifications that adequately support the regulation of express advocacy do not apply to significant quantities of speech encompassed by the definition of electioneering communications." *Id.* In rejecting this argument, the plurality observed that many of the so-called issue advertisements that were broadcast during the short periods before elections (i.e., in the electioneering window) were the functional equivalent of express advocacy. *Id.* at 206, 124 S.Ct. 619. As to such advertisements, the plurality held that "[t]he justifications for the regulation of express advocacy apply equally to ads aired during those periods if the ads are intended to influence the voters' decisions and have that effect." *Id.* Thus, the *McConnell* plurality determined that express advocacy and issue advocacy mentioning candidates in the electioneering window could constitutionally be regulated as long as the speech in question was the functional equivalent of express advocacy. The plurality, however, did not apply the concept of the "functional equivalent of express advocacy" as a means of identifying express advocacy in communications lacking the "magic words," as Ethics Watch seems to suggest.

Similarly, in *Wisconsin Right to Life*, 551 U.S. at 472, 127 S.Ct. 2652, Chief Justice Roberts, writing for himself and Justice Alito with three other members of the Court concurring in the judgment, seized on the concept of the "functional equivalent of express advocacy" not to *expand* the category of advertisements that could permissibly be regulated under the First Amendment, as Ethics Watch apparently argues, but rather to *limit* the types of *electioneering communications* that could constitutionally be regulated. As the Chief Justice explained:

> *Every* ad covered by BCRA § 203 will by definition air just before a primary or general election. If this were enough to prove that an ad is the functional equivalent of express advocacy, then BCRA would be constitutional in all of its applications. This Court unanimously rejected this contention in [*Wisconsin Right to Life, Inc. v. Federal Election Comm'n*, 546 U.S. 410, 126 S.Ct. 1016, 163 L.Ed.2d 990 (2006) (per curiam) ].

*Id.* (emphasis in original). Thus, the Chief Justice concluded that, if an electioneering communication did not use one of the "magic words," and if it was reasonably susceptible of an interpretation other than as an appeal to vote for or against a specific candidate, then it could not be regulated. *Id.* at 469–70, 481, 127 S.Ct. 2652; *see also* 11 C.F.R. § 114.15 (2009) (adopting the "susceptible of no reasonable interpretation other than as an appeal to vote for or against a clearly identified Federal candidate" standard in connection with electioneering communications).

Here, unlike in *Wisconsin Right to Life*, we are not asked to determine what electioneering communications can properly be regulated. Rather, this case involves only independent expenditures, defined to encompass expenditures for the purpose of expressly advocating the election or defeat of a candidate for office. Thus, the functional equivalency concept discussed in *Wisconsin Right to Life* is inapplicable in this case.

Nor are we persuaded by Ethics Watch's argument that Colorado voters intended to adopt the definition of "express advocacy" contained in a regulation previously adopted by the Federal Election Commission, 11

C.F.R. § 100.22(b) (2009). That regulation defined "expressly advocating" as any message that

> [w]hen taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because—
>
> (1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and
>
> (2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action.

*Id.*

The Ninth Circuit Court of Appeals adopted a similar approach in *Federal Election Commission v. Furgatch*, 807 F.2d 857, 862–64 (9th Cir.1987). In *Furgatch*, the court held that "context is relevant to a determination of express advocacy. A consideration of the context in which speech is uttered may clarify ideas that are not perfectly articulated, or supply necessary premises that are unexpressed but widely understood by readers or viewers." *Id.* at 863–64.

Ethics Watch argues that the Federal Election Commission regulation and the Ninth Circuit's decision in *Furgatch* show that the meaning of "express advocacy" was not settled at the time that article XXVIII was enacted, as respondents contend. Ethics Watch further asserts that because these authorities existed at the time article XXVIII was enacted, the voters must be presumed to have known of their existence and to have intended to incorporate them into the amendment. For two reasons, we are not persuaded.

■ First, although these examples might support an argument that the *federal* definition of express advocacy was still in flux at the time Colorado voters amended our state constitution, such definitions were not binding on *state* courts in their interpretation of *state* campaign finance laws. *See Hesson v. Industrial Comm'n*, 740 P.2d 526, 528

(Colo.App.1987) (federal administrative definition of a federal statutory term was not binding on a state court's interpretation of the same term in a state statute, although such definition might be indicative of the term's meaning).

Second, prior to the passage of article XXVIII, a division of this court had specifically examined and rejected the so-called contextual approach reflected in the federal regulation and *Furgatch*. *League of Women Voters*, 23 P.3d at 1275–76. The division determined that such an approach "raises both vagueness and overbreadth problems" and would be extremely difficult to apply. *Id.* We will not presume that Colorado voters intended to ignore Colorado case law and to adopt a construction of express advocacy that a division of this court had squarely rejected just one year before.

For these reasons, we conclude that the definition employed by the ALJ, which we affirm here, is consistent with the language of our state constitution, correctly reflects the intent of the voters in adopting article XXVIII, and strikes an appropriate balance between protecting political speech and addressing the concerns of the voters as expressed in article XXVIII.

## VI. Application

Having determined the meaning of "expressly advocating," as that term is used in our state constitution, we now turn to applying this construction to the facts of this case. We conclude that the ALJ did not err in dismissing Ethics Watch's complaint against respondents and therefore affirm.

■ Here, Ethics Watch first objects to a series of advertisements that generally indicated that the candidates were running for office, discussed the candidates' qualifications, and encouraged voters to call the candidates to thank them for their work on particular issues. Ethics Watch next singles out one advertisement as violating even a strict "magic words" test. That advertisement stated, in pertinent part, "Local leaders *endorse* Dave Kerber." (the Kerber advertisement) (emphasis in original). Ethics Watch argues that the use of the word "en-

dorse" renders this advertisement express advocacy. We address each of these contentions in turn.

As to the series of advertisements to which Ethics Watch first objects, we perceive no error in the ALJ's determination that such advertisements do not rise to the level of express advocacy. None of these advertisements uses any of the *Buckley* "magic words," nor do they use words substantially similar to or synonymous with those words. Accordingly, these advertisements do not meet the definition of express advocacy that we have adopted today.

As to the Kerber advertisement, we agree with the ALJ's determination that the manner in which that advertisement used the word "endorse," which is one of the *Buckley* "magic words," did not render it express advocacy. As the ALJ found, as used there, the word "endorse" did not expressly exhort the reader to support Kerber. It only informed the reader that others did so. We further agree with the ALJ that although the Kerber advertisement was clearly intended to encourage the reader to vote for him, it stopped short of expressly telling the reader to do so.

For these reasons, we affirm the ALJ's dismissal order.

## VII. Attorney Fees and Sanctions

SMF asserts that the ALJ erred in denying its request for attorney fees against Ethics Watch because, it claims, Ethics Watch's complaint was frivolous and vexatious. In addition, SMF argues that Ethics Watch's appeal in this matter is frivolous, thus warranting an award of attorney fees on appeal. Ethics Watch responds with a cross-motion for sanctions against SMF, arguing that SMF's cross-appeal was frivolous as filed. We reject these contentions.

Pursuant to section 1–45–111.5(2), C.R.S. 2009, an ALJ may impose sanctions of attorney fees and costs against any party who it finds brought or defended an action that lacks substantial justification. A claim lacks substantial justification if it is "substantially frivolous, substantially groundless, or substantially vexatious." *Id.*

Although the terms "substantially frivolous" or "substantially vexatious" as they are used in section 1–45–111.5(2) are not defined in that statute, as a division of this court has noted, section 13–17–102, C.R.S. 2009 contains the identical terms. *Colorado Citizens for Ethics in Government,* 187 P.3d at 1220. Accordingly, we may look to case law construing section 13–17–102 for guidance. *See B. G.'s, Inc. v. Gross,* 23 P.3d 691, 694 (Colo.2001) (because the legislature is presumed to intend that statutes concerning the same subject will be consistent and harmonious, consideration of other statutes dealing with the same subject is an extrinsic aid that can be useful in deciding questions of statutory interpretation). Under the case law construing section 13–17–102, a claim is frivolous if its proponent can present no rational argument based on the evidence or the law to support it. *Double Oak Constr., L.L.C. v. Cornerstone Dev. Int'l. L.L.C.,* 97 P.3d 140, 151 (Colo.App.2003). A claim is vexatious if it is brought or maintained in bad faith to annoy or harass another. *Consumer Crusade, Inc. v. Clarion Mortgage Capital, Inc.,* 197 P.3d 285, 289–90 (Colo.App. 2008).

Applying these principles here, we conclude that Ethics Watch's claims were not lacking in substantial justification as to SMF. Therefore, we affirm the ALJ's denial of SMF's request for attorney fees, and we likewise deny SMF's request for attorney fees on appeal.

We also conclude that SMF's contentions on appeal were neither frivolous nor groundless. Accordingly, we deny Ethics Watch's request for sanctions against SMF.

## VIII. Conclusion

For these reasons, the ALJ's orders are affirmed.

Judge CASEBOLT and Judge BOORAS concur.